CV 13-4030

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

UNITED STATES OF AMERICA, *ex rel.*
SATISH K. DESHPANDE, M.D., and the
STATE OF NEW YORK, *ex rel.*
SATISH K. DESHPANDE, M.D.

Plaintiff,

-against-

THE JAMAICA HOSPITAL MEDICAL CENTER;
TJH MEDICAL SERVICES, P.C.; MEDISYS
MANAGEMENT, LLC; ANTHONY DIMARIA,
M.D.; and THOMAS SANTUCCI, JR., M.D.

Defendants.

-----------------------------------------------------------------

COMPLAINT

JOHNSON

ORENSTEIN, M.J.

Plaintiffs the United States, the State of New York and Relator Satish K. Deshpande,

M.D., by and through their undersigned counsel, hereby allege for their Complaint against the

Jamaica Hospital Medical Center, TJH Medical Services P.C., Medisys Management, LC,

Anthony DiMaria, M.D., and Thomas Santucci, Jr., M.D. ("Defendants"), as follows:

## INTRODUCTION

1.       Relator Satish K. Deshpande, M.D., brings this *qui tam* action under the False

Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and the New York False Claims Act

("NYFCA"), N.Y. Fin. Law § 187, *et seq.*, on behalf of himself, the United States of America,

and the State of New York, to recover money damages and civil penalties arising from false

statements and false claims knowingly submitted or knowingly caused to be submitted to the

federal government by defendants the Jamaica Hospital Medical Center ("Jamaica Hospital),

TJH Medical Services, P.C. ("TJH"), Medisys Management, LLC ("Medisys Management"),

Anthony DiMaria, M.D. ("DiMaria"), and Thomas Santucci, Jr., M.D. ("Santucci").

2.     Jamaica Hospital falsely and fraudulently submitted claims to and received payments from the United States and the State of New York by submitting false hospital cost reports and a substantial number of false claims for Medicare and Medicaid reimbursement. Those claims reflected medical services provided to patients who were referred to Jamaica Hospital by TJH, and doctors employed by TJH, DiMaria, and Santucci, at a time when TJH and its doctors were receiving illegal kickbacks from, and engaged in an illegal financial relationship with, Jamaica Hospital. As the owner of TJH, and one of Jamaica Hospital's major sources of referrals, DiMaria and TJH's employees referred tens of thousands of patients to Jamaica Hospital during the relevant period.

3.     In particular, Jamaica Hospital paid thousands of dollars to DiMaria and TJH from 1995 to the present to induce TJH doctors to refer patients to Jamaica Hospital for designated health services. Although the purported purpose of those payments was to compensate DiMaria and TJH for the expenses associated with servicing patients at Jamaica Hospital, in fact, the payments far exceeded those expenses.

4.     As explained in detail below, the relationship between DiMaria, TJH, and Jamaica Hospital violated the federal Stark Law and the federal and state anti-kickback laws. In their cost reports and claims for reimbursement under Medicare and Medicaid, Jamaica Hospital, TJH, DiMaria and Santucci falsely certified that they were in compliance with applicable state and federal laws and regulations and otherwise eligible for reimbursement for designated health services provided by Jamaica Hospital and TJH to patients referred to the hospital by DiMaria, Santucci and other physicians employed by TJH.

5.     In addition, in or about 2008 and continuing to the present, Jamaica Hospital instituted a policy whereby TJH doctors in the Physical Medicine and Rehabilitation Department

2

were routinely directed to consult on patients admitted to Jamaica Hospital without a request from the attending physician. Jamaica Hospital and/or TJH then billed Medicare and/or Medicaid for these medically unnecessary consultations.

6.      Under the FCA and the NYFCA, Defendants are liable for treble damages and penalties for each claim that they submitted to Medicare or Medicaid during the period from approximately January 1994 to the present with respect to patients referred to Jamaica Hospital by DiMaria, Santucci, and physicians employed by TJH, and for medically unnecessary consultations.

## PARTIES

7.      Plaintiff United States of America, acting through the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), is responsible for administering the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (Act), 42 U.S.C. §§ 1395 et seq. ("Medicare"), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

8.      Plaintiff New York State, acting through the Department of Health (DOH), is responsible for administering the New York State Medicaid program.

9.      Relator, Satish Deshpande, M.D. ("Deshpande"), is a citizen of the State of New York and brings this action on behalf of the United States of America pursuant to the private action provisions of the False Claims Act, 31 U.S.C. § 3730(b).

10.     Defendant The Jamaica Hospital Medical Center is a domestic not-for-profit corporation incorporated under the laws of the State of New York having its principal place of business at 8900 Van Wyck Expressway, Jamaica, New York 11418. Jamaica Hospital renders

medical care, assistance and treatment to the general public, and bills for, and receives a substantial amount of its revenue from Medicare and Medicaid.

11.     Defendant Anthony DiMaria is a citizen of the State of New York and is a member of the Board of Trustees of the Medisys Health Network ("Medisys"), of which the Jamaica Hospital is a member.  DiMaria is also a member of the Board of Trustees and Medical Director of Jamaica Hospital, a member of the Board of Trustees of Medisys Management, and owner, majority shareholder, and President of TJH.  DiMaria is also Medical Director of Trump Pavilion (hereafter "Trump"), a nursing home affiliated with Jamaica Hospital and located at 89-40, 135th Street, Jamaica, NY 11418.

12.     Defendant TJH Medical Services, P.C., is a for-profit professional corporation duly incorporated in the State of New York, having its principal place of business at 134-20 Jamaica Ave, NY 11418.  Pursuant to an agreement with Jamaica Hospital, TJH provides professional medical services to Jamaica Hospital's patients.  TJH bills for, and receives, a substantial amount of its revenue from Medicare and Medicaid, and has done so during all relevant times set forth in this Complaint.

13.     Defendant Thomas Santucci, Jr., M.D., is a citizen of the State of New York, with a principal place of business at 8900 Van Wyck Expressway, Jamaica, NY 11418.  Santucci is employed full-time by Jamaica Hospital as its Chairman of Medicine, and is the Vice-President and a minority shareholder of TJH.

14.     Defendant Medisys Management LLC, is a medical staff organization that manages the business arrangements and the employment of the physicians that work at Jamaica Hospital, and is affiliated with, and functioning under, the umbrella of Medisys, with its principal place of business at 89-06, 135th Street, Jamaica, NY 11418.

4

## JURISDICTION AND VENUE

15.    This court has jurisdiction over this action under 31 U.S.C. § 3732(a) & (b), and

28 U.S.C. § 1331 & 1367.

16.    Venue is proper in the Eastern District of New York, pursuant to 28 U.S.C. §

1391(b) and 31 U.S.C. § 3732(a) in that at least one of the defendants can be found, resides

and/or transacts business in this District and in that a substantial number of the false claims at

issue were submitted or caused to be submitted in this District.

## STATUTORY FRAMEWORK

**A.     The False Claims Act**

17.    The FCA provides, in pertinent part, that:

(a) (1) . . . [A]ny person who (A) knowingly presents, or causes to be presented, a
false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or
causes to be made or used, a false record or statement material to a false or
fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), . .
. or (G); . . . or (G) knowingly makes, uses, or causes to be made or used, a false
record or statement material to an obligation to pay or transmit money or property
to the Government, or knowingly conceals or knowingly and improperly avoids or
decreases an obligation to pay or transmit money or property to the Government . .
. . is liable to the United States Government . . . .

*    *    *

(b) (1) [T]he terms "knowing" and "knowingly" --

(A) mean that a person, with respect to information (i) has actual
knowledge of the information; (ii) acts in deliberate ignorance of the truth or
falsity of the information; or (ii) acts in reckless disregard of the truth or falsity of
the information, and

(B) require no proof of specific intent to defraud

31 U.S.C. § 3729.

18.     Any person who violates the False Claims Act is liable to the United States for up to three times the amount of damages sustained by the federal government and civil penalties of between $5,500 and $11,000 for each claim submitted to the United States.

**B.     The New York False Claims Act**

19.     The NYFCA provides, in pertinent part, that any person who:

> (a) knowingly presents, or cause to be presented a false or fraudulent claim for payment or approval;
>
> (b) knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (c) conspires to commit a violation of paragraph (a), (b) . . . of this subdivision;
>
> *       *       *
>
> shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.

N.Y. Fin. L. § 189(a).

20.     "Knowing and knowingly" mean that a person, with respect to information:

> (i) has actual knowledge of the information;
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> (iii) acts in reckless disregard of the truth or falsity of the information....

N.Y. Fin. L. § 188(3).

21.     "State" means "the state of New York and any state department, board, bureau, division, commission, committee, public benefit corporation, public authority, council, office or other governmental entity performing a governmental or proprietary function for the state." N.Y. Fin. L. § 188(9).

C.    **The Medicare Program**

22.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-state renal disease. *See* 42 U.S.C. §§ 426, 426A.

23.    HHS is responsible for the administration and supervision of the Medicare Program. CMS, formerly known as the Health Care Financing Administration, is an agency of HHS and directly responsible for the administration of the Medicare program.

24.    The Medicare Program has several parts, one of which, commonly referred to as "Medicare Part A," authorizes payments for institutional care, including, hospital, skilled nursing facility, and home health care. 42 U.S.C. §§ 1395c-1395i-4.

25.    Medicare Part B covers physician services as well as a variety of "medical and health services," including durable medical equipment and supplies.

26.    In addition to other limitations on coverage, Medicare covers only those services that are "reasonable and necessary." 42 U.S.C. § 1395(a)(1)(A).

27.    To participate in the Medicare program, a medical provider must file a provider agreement with the Secretary of HHS ("Secretary"). 42 U.S.C. § 1395(cc). The provider agreement requires compliance with the requirements that the Secretary deems necessary for participation in the program. *Id.*

28.    Form CMS-855A is the Enrollment Application for providers. All providers, including Jamaica Hospital, TJH, DiMaria, Santucci, and the TJH physicians, are required to execute this form to participate in Medicare and receive reimbursement. As part of completing the CMS-855A, a certification must be executed, which reads in pertinent part:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions

7

are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the providers compliance with all applicable conditions of participation in Medicare.

29.     The rules governing the Medicare Program are set forth in the statute (the "Medicare Act"), regulations, and the manuals, rulings and other policy statements issued by CMS, including, but not limited to the Provider Reimbursement Manual and the CMS Online Manual System.

### i. Medicare Part A

30.     To assist in the administration of Medicare Part A, CMS contracts with entities known as "fiscal intermediaries." 42 U.S.C. § 1395h; *see* 42 C.F.R. Part 421, Subparts A and B.

31.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92 or Form UB-04.

32.     In submitting Medicare claim forms, including the UB-92s and UB-04s at issue in this litigation, providers must certify that the information included on the form presents an accurate description of the services rendered and that the services were medically necessary.

33.     The Secretary, acting through the fiscal intermediaries, reimburses hospitals in accordance with the laws and HHS regulations governing the Medicare program. 42 U.S.C. § 1395h.

34.     Medicare reimburses inpatient hospital costs pursuant to the inpatient hospital prospective payment system ("PPS"). Under PPS, hospitals, including Jamaica Hospital, are reimbursed a prospectively determined amount for each discharge, depending on the diagnosis-

related group ("DRG") which is assigned to the discharge.  42 U.S.C. § 1395ww(d); 42 C.F.R. § 412.1 *et seq.*

35.     This case involves, among other things, fraudulent hospital cost reports which Jamaica Hospital submitted, and Dr. DiMaria and Santucci caused to be submitted, to the Medicare program.  A key purpose of the Medicare cost report system is to protect the federal government at all times from loss due to mistake or fraud.  This goal is accomplished in several ways.

36.     First, as a prerequisite to *final* payment by Medicare Part A, CMS requires hospitals, including Jamaica Hospital, to submit hospital cost reports annually.  Cost reports are the final claim that a provider hospital submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.  Each year's report covers all the interim requests for reimbursement made on the UB-92 and UB-04 forms submitted during that cost reporting year.

37.     Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1). Each cost report form reflects this reliance because it expressly states the consequences of a failure or refusal to certify:

> This report is required by law (42 U.S.C. § 1395g; 42 C.F.R. 413.20(b)).  Failure to report can result in all interim payments made since the beginning of the cost report being deemed overpayments.  (42 U.S.C. § 1395g).

42 C.F.R. §§ 405.1803, 413.60, and 413.64(f(1).  Cost reports are due on or before the last day of the fifth month following the close of the cost report period.  Thereafter, it may take 18 months or so for CMS, through its fiscal intermediaries, to complete an audit of the cost report.

9

38.     Second, after its review of the cost report, the fiscal intermediary issues a Notice of Program Reimbursement ("NPR") with its findings regarding the reconciliation of interim payments and the actual amount of the final payment as determined by the fiscal intermediary. Should the fiscal intermediary's audit conclude that an overpayment was made, that finding is reported in the NPR. The NPR serves as the basis for the intermediary immediately demanding payment of the contested amount within thirty (30) days, or it can withhold the contested amount from on-going reimbursements for the current year's services. 42 C.F.R. §§ 405.1803 & 413.64(f).

39.     Third, the fiscal intermediary has the authority to demand or implement immediate repayment of the full contested amount, even though the provider has several levels of appeals with the HHS bureaucracy, as well as a right to appeal to the appropriate United States District Court and the respective Circuit Court of Appeals after applicable administrative remedies have been exhausted.

40.     Each hospital cost report contains a certification, which is broad and explicit, and must be signed by the chief administrator of the provider or a responsible designee of the administrator. As a preface to the cost report's certification, the following warning appears:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

41.     For all the fiscal years at issue here, the responsible provider official was required to certify, and did certify, in pertinent part:

10

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and . . . that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

42.     Thus, Jamaica Hospital, as a Medicare hospital provider, was required to,  and did, execute the cost report certification for each year from 1994 to 2011 to certify, among other things, that the filed hospital cost report is (1) truthful, *i.e.,* that the cost information contained in the report is true and accurate; (2) correct, *i.e.,* that Jamaica Hospital was entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.,* that the hospital cost report is based upon all information known to Jamaica Hospital the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Statute (described below).

**ii.     Medicare Part B**

43.     Medicare Part B covers physician services and a variety of "medical and health services."

44.     42 U.S.C. § 1861(q) defines "physician services" as certain professional services performed by physicians, including surgery, consultation, and home, office, and institutional calls.

45.     To assist in the administration of Medicare Part B, CMS contracts with "carriers." Carriers, typically insurance companies, are responsible for processing and paying claims.

46.     Doctors and other providers are required to submit Medicare Part B claims to the carrier for payment on HCFA Form 1500, which provides, in pertinent part:  "This is to certify that the foregoing information is true, accurate and complete.  I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims,

statements, or documents, or concealment of a material fact, may be prosecuted under applicable federal or State laws." 42 C.F.R § 424.32.

47.     No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations.  42 C.F.R. § 424.32.

48.     Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries.  *See* 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1).  For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality.  42 C.F.R. §§ 405.502-504.

49.     At all relevant times, HCFA Form 1500 forms submitted by TJH on behalf of all physician employees, were signed by DiMaria and Santucci, on behalf of the TJH physicians who were required to assign their Medicare and Medicaid payments to TJH.

**D.     The Medicaid Program**

50.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is largely limited to providing matching federal funds and ensuring that states comply with minimum standards in the administration of the program.

51.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 *et seq.*

52.     To participate in the Medicaid program, a state must develop a plan that is approved by the Secretary as meeting federal requirements.  The state pays qualified providers for furnishing necessary services covered by the state plan to individuals who are eligible for

medical assistance. The federal government contributes a proportion of the costs that each participating state incurs in purchasing items and services from qualified providers on behalf of eligible persons. The state bears the remainder of the costs. In New York, funding for the Medicaid program is approximately 50% federal funds and 50% state and local funds.

53.    New York's Medicaid program must, and does cover hospital services. 42 U.S.C.§1396a(10)(A), 42 U.S.C. § 1396d(a)(l)-(2).

54.    In New York, providers, including hospitals, participating in the Medicaid program submit claims for services rendered to Medicaid beneficiaries to the New York State Department of Health for payment.

55.    The Medicaid Program pays participating hospitals a fixed amount per discharge based on the Medicaid beneficiary's discharge diagnosis. Specifically, the participating hospital submits a claim for reimbursement to Medicaid under the DRG payment system, which reimburses a fixed amount per patient based on the DRG code into which the patient is classified by the hospital. The average cost of care for each DRG determines the reimbursement amount, rather than the actual cost of care for each beneficiary.

56.    Providers rendering medical care to Medicaid-eligible patients may be reimbursed by the Medicaid program for their services. Upon submission of a claim, the provider is reimbursed for approved services rendered in accordance with a standard scheduled rate for each particular service provided.

57.    New York State Medicaid regulations explicitly prohibit Medicaid providers from seeking reimbursement for services rendered to patient who come to their facility through payment of referral fees.

58.     In particular, 18 N.Y.C.R.R. § 504.6(d) requires that a provider submit Medicaid claims only for services provided in compliance with Title 18 of the Official Compilation of Code, Rules and Regulations of New York State.

59.     18 N.Y.C.R.R. § 515.2(b)  prohibits as an "unacceptable practice":

(5) Bribes and Kickbacks . . . (i) soliciting or receiving either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for referring a client to a person for any medical care, services or supplies for which payment is claimed under the program[; and]

*     *     *

(iii) offering or paying either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for referring a client to a person for any medical care, services or supplies for which payment is claimed under the program.

60.     18 N.Y.C.R.R. § 515.2(a) also specifically prohibits as an "unacceptable practice" conduct that is contrary to:

(3) the official rules and regulations of the Departments of Health, Education and Mental Hygiene, including the latter department's offices and divisions, relating to standards for medical care and services under the program; or

(4) the regulations of the Federal Department of Health and Human Services promulgated under title XIX of the Federal Social Security Act.

61.     Title 18 further provides that "no payments will be made to or on behalf of any person for the medical care, services or supplies furnished . . . in violation of any condition of participation in the program," 18 N.Y.C.R.R. § 515.5(a), (b), and that Medicaid payments may be withheld "when [the Department] has reliable information that a provider is involved in fraud or willful misrepresentation involving claims submitted to the program," *id.* at § 518.7(a).

62.     To receive reimbursement from Medicaid in New York State, all providers who participate in electronic billing, as does Jamaica Hospital and TJH, must sign a Certification

Statement for Provider Utilizing Electronic Billing (the "Medicaid Electronic Certification")

every year. The Medicaid Electronic Certification reads, in pertinent part:

> I (or the entity) have furnished or caused to be furnished the care, services and
> supplies itemized and done so in accordance with applicable federal and state
> laws and regulations.
>
> \*   \*   \*
>
> In submitting claims under this agreement I understand and agree that I (or the
> entity) shall be subject to and bound by all rules, regulations, policies, standards,
> fee codes and procedures of the New York State Department of Health as set forth
> in title 18 of the Official Compilation of Codes, Rules and Regulations of New
> York State and other publications of the Department, including Medicaid
> Management Information Systems Provider Manuals and other official bulletins
> of the Department.

## E.   The Federal Anti-Kickback Statute

63.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of

Congressional concern that payoffs to those who can influence healthcare decisions will result in

goods and services being provided that are medically unnecessary, of poor quality, or harmful to

a vulnerable patient population. To protect the integrity of the program from these harms, which

are difficult to detect, Congress enacted a per se prohibition against the payment of kickbacks in

any form, regardless of whether the particular kickback gave rise to overutilization or poor

quality or care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to

ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social

Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b,

Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and

Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

64.     The Anti-Kickback Statute prohibits any person or entity from making or

accepting payment to induce or reward any person for referring, recommending or arranging for

federally-funded medical services, including services provided under the Medicare or Medicaid

programs.  In pertinent part, the statute states:

(b) Illegal remuneration

(1) whoever knowingly and willfully solicits or receives any remuneration
(including any kickback, bribe, or rebate) directly or indirectly, overtly or
covertly, in cash or in kind –

(A) in return for referring an individual to a person for the furnishing or
arranging for the furnishing of any item or service for which payment may
be made in whole or part under a Federal health care program, . . .

shall be guilty of a felony and upon conviction thereof, shall be fined not more
than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration
(including any kickback, bribe, or rebate) directly or indirectly, overtly or
covertly, in cash or in kind to any person to induce such person –

(A) to refer an individual to a person for the furnishing or arranging for the
furnishing of any item or service for which payment may be made in
whole or part under a Federal health care program, . . .

shall be guilty of a felony and upon conviction thereof, shall be fined not more
than $25,000 or imprisoned for not more than five years, or both.

65.     Violation of the statue can also subject the perpetrator to exclusion from

participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of $50,000 per violation and three times the amount of remuneration paid.  42 U.S.C. §

1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

**F.  The Stark Statute**

66.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn

(commonly known as the "Stark Statute") prohibits a hospital (or other entity providing

designated health services) from submitting Medicare claims for designated health services (as

defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a

"financial relationship" (as defined in the statute) with the hospital, and prohibits Medicare from paying any such claims. The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353 (2006).

67.     The Stark Statute establishes the clear rule that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers. The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

68.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider unless a statutory or regulatory exception applies. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

69.     In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

70.     The Stark Statute prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the hospital has a "financial relationship," unless a statutory exception applies. "Designated health services" include inpatient and outpatient hospital services. 42 U.S.C. § 1395nn(h)(6).

71.     In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals

(1)     In general

17

> Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then --
>
> > (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
> >
> > (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(l).

72.     When determining whether a direct or indirect compensation arrangement exists between a physician and an entity to which the physician refers patients for designated health service, the referring physician stands in the shoes of:  (1) another physician who employs the referring physician; (2) his or her wholly-owned professional corporation; (3) a physician practice that employs or contracts with the referring physician; or (4) a group practice of which the referring physician is a member or independent contractor.

73.     The Stark Statute further provides that Medicare will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a).  42 U.S.C. § 1395nn(g)(l).

74.     "Financial relationship" includes a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly to a referring physician. 42 U.S.C. §§ 1395nn(h)(l)(A) and (h)(1)(B).

75.     The Stark Statute and regulations contain exceptions for certain compensation arrangements.  These exceptions include, among others, "bona fide employment relationships," "personal services arrangements," and "physician incentive plans."

18

76.     In order to qualify for the Stark Statute's exception for bona fide employment relationships, compensation arrangements must meet, inter alia, the following statutory requirements:  (A) the amount of the remuneration is fair market value and was not determined in a manner that takes into account (directly or indirectly) the value or volume of referrals, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital.  42 U.S.C. §§ 1395nn(e)(2)(B) and (e)(2)(C).

77.     In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, inter alia, the following statutory requirements:  (A) the compensation does not exceed fair market value, and (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further "physician incentive plan" exception as described in the statute).  42 U.S.C. § 1395nn(e)(3)(A)(v).

78.     A "physician incentive plan" under § 1395nn(e)(3) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S.C. § 1395nn(e)(3)(B)(ii).

79.     The Stark Statute also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a state Medicaid program. 42 U.S.C. § 1396b(s).

## THE FRAUDULENT SCHEMES

**A.    The Creation of TJH**

80.     At all relevant times, DiMaria was (a) a member of the Board of Trustees of Jamaica Hospital, Brookdale Hospital Medical Center, and Flushing Hospital Medical Center,

and (b) the Medical Director of Jamaica Hospital, Trump Pavilion and Schulman Nursing Home, all of which are not-for-profit organizations.

81.     In or around 1994, DiMaria created TJH Medical Service, P.C., a for-profit Professional Corporation created under the laws of the State of New York.  DiMaria owns, and is President of, TJH, and receives a salary from TJH, although he does not practice medicine through TJH.

82.     Towards the end of 1994, DiMaria used his position and authority as a Board Member of the aforementioned entities to establish a financial and professional relationship in the form of an arrangement between TJH and Jamaica Hospital to provide professional medical services to the patients admitted to Jamaica Hospital.

83.     Pursuant to this arrangement, Jamaica Hospital pays TJH to provide doctors to treat service and private patients at Jamaica Hospital.  TJH pays Medisys Management to manage its business.

84.     Further, pursuant to the agreement between Jamaica Hospital and TJH, on or about January 1995, most of the doctors providing services to patients at Jamaica Hospital were transferred to TJH.  In other words, doctors employed by Jamaica Hospital were advised that their employer would be TJH, and not Jamaica Hospital, although their duties at Jamaica Hospital remained unchanged.  From then onwards, all of the physician employees, except Santucci, ceased to be employees of Jamaica Hospital and became employees of TJH.

85.     In the late 1990's, DiMaria, in his capacity of Medical Director of Jamaica Hospital, hired Santucci as a full-time Chairman of Medicine with a full-time salary.  In his capacity as Chairman of Medicine of Jamaica Hospital, Santucci reported directly to DiMaria.

86.     Soon after Santucci's appointment as Chairman of Medicine, DiMaria offered him the position of Vice-President of TJH, and 25% of TJH's stock, along with a salary from TJH, in addition to the salary he was receiving from Jamaica Hospital.

87.     As Chairman of Medicine, Santucci had the authority to control the professional and administrative behavior of doctors employed by TJH but working at Jamaica Hospital, including, but not limited to, hiring and firing, and work assignments in the Department of Medicine.

88.     By virtue of his assignments of doctors in the Department of Medicine, Santucci controlled and directed all the referrals of hospitalized patients at Jamaica Hospital to TJH physicians.

89.     As owner of TJH, Santucci also controlled and directed all referrals of patients treated at TJH to Jamaica Hospital.

90.     Santucci also played an active role in hiring of all of the physicians at  TJH including primary care physicians and specialists ("Consultants").  Defendant Santucci also controlled and directed all the referrals of TJH patients to various Consultants of TJH and to Jamaica Hospital of which he is an employee.

91.     DiMaria used his position and authority as the Medical Director of Trump Pavilion and Schulman Nursing Home to assign the nursing home patients to physicians who were hired by TJH to provide services to the Jamaica Hospital patients.

92.     In short, TJH Physicians were assigned patients at Jamaica Hospital by Santucci and at Trump Pavilion and Schulman by DiMaria.  Thus DiMaria and Santucci insured that patients who were admitted to Jamaica Hospital for treatment without a private physician were

assigned to TJH Physicians for hospital care, which Physician would in turn refer those patients to TJH for follow-up care after their discharge from hospital.

93.     Similarly, DiMaria and Santucci insured that patients who were admitted to Trump Pavilion and Schulman Nursing Home for both short-term rehabilitation and long-term nursing care would be assigned by TJH Physicians, who would in turn refer those patients to TJH for follow-up post-discharge care or for specialty consultations from a TJH Specialist.

**B.     Referring Physicians and Designated Health Services**

94.     As part of their routine medical practice, the TJH Physicians established for their patients a plan of care that included the provision of in-patient hospital and nursing home care, consultations with other physicians, requests for radiological, cardiac, pulmonary, and gastroenterological procedures, physical, occupational, and speech therapies, and laboratory tests at Jamaica Hospital.  They also engaged in ordering, certifying, and recertifying home care services, equipment, and in-patient and nursing home services.  Many of these services were paid for by Medicare and Medicaid because many of TJH's patients were Medicare and/or Medicaid beneficiaries.

95.     Therefore, TJH Physicians made "referrals" to Jamaica Hospital, Trump Pavilion, and TJH, all of which provided designated health services.

96.     By making such requests for, and ordering and certifying or recertifying designated health services, each and every TJH Physician acted as a "referring physician" within the meaning of 42 C.F.R. § 351.

97.     Some of the designated health services provided at Jamaica Hospital as a result of the referrals by TJH Physicians, were technical components that were billed by Jamaica Hospital, while the professional components were billed by TJH.

22

98.     Although some of the Consultants were specialists who personally performed some of the designated health services, no designated health service was ever personally performed by the referring TJH Physician who initiated  the referral to Jamaica Hospital or Trump Pavilion or to TJH and requested the consultation as part of his referral.

99.     DiMaria and Santucci, as owners and officers of TJH, directed and controlled the TJH Physicians' referrals to Jamaica Hospital and Trump Pavilion for designated health services.

100.     Thus, at all relevant times, TJH, DiMaria and Santucci were "referring physicians" within the meaning of 42 C.F.R. § 351.

**C.     Compensation Arrangement Between TJH and TJH Physicians**

101.     When the doctors employed by Jamaica Hospital were transferred to TJH, they entered into employment agreements with TJH.

102.     At all relevant times, those employment agreements required TJH doctors to provide professional medical services to both hospital patients and private patients of TJH.

103.     The employment agreements defined "Hospital patients" as "(i) Hospital inpatients; (ii) Hospital ambulatory care patients originating in a Hospital clinic or emergency room; and/or (iii) patients assigned to [the TJH doctor] following accessing care at any non-Hospital clinical site comprising a component of the Medisys Health Network."

104.     The employment agreements also prohibited TJH Physicians from providing medical and professional services outside of TJH, and the hospitals and nursing homes owned by or operated under Medisys.

105.     Although there are minor differences in the various contracts, they all provide that the TJH physicians will be paid a "base salary," plus "practice earnings" of 60% of "office generated revenue," 60-80% of "hospital generated revenue," and 80% of "Trump Tower

generated revenue." Some Consultants receive as much as 85% of hospital and Trump generated revenues.

106.    In addition, Santucci recruited, and TJH employed, other physicians who did not enter written contracts but were also paid a "base salary" plus "practice earnings" based on a percentage of the revenue generated by that physician.

107.    In other words, TJH Physicians received a percentage of the collections received by TJH from federal health care programs and private insurers for medical treatment provided by the physician at TJH, Jamaica Hospital and/or Trump Pavilion. This percentage was in addition to the fixed base salary the TJH Physician received for performing medical services at TJH, Jamaica Hospital and/or Trump Pavilion. Santucci often referred to this compensation as "top dollars."

108.    Thus, a TJH Physician's compensation was not set in advanced, consistent with fair market value, but was determined in a manner that took into account the volume or value of referrals or other business generated by the referring TJH Physician.

109.    The contracts also provided that all billing and collecting of revenues was the responsibility of TJH and its MSO, MediSys Management.

**D.    Illegal Self-Referrals**

110.    The compensation arrangements between TJH and Jamaica Hospital, between Jamaica Hospital and Santucci, and between TJH and Santucci and DiMaria, result in illegal self-referrals between the TJH Physicians and Jamaica Hospital.

111.    Specifically, Jamaica Hospital pays TJH for its operations and TJH pays DiMaria and Santucci, both of whom stand in the shoes of TJH, of which they are owners. Thus, DiMaria and Santucci each have a direct compensation arrangement with Jamaica Hospital.

112.    Further, Jamaica Hospital pays TJH which then pays a salary and a percentage of practice earnings to the TJH Physicians, each of whom stand in the shoes of TJH, of which they are employees. Thus, each of the TJH Physicians also has a direct compensation arrangement with Jamaica Hospital.

113.    Additionally, each of the TJH Physicians has an indirect compensation arrangement with Jamaica Hospital by standing in the shoes of TJH, which is paid by Jamaica Hospital, and receiving aggregate compensation based on the volume and value of referrals made to Jamaica Hospital, of which Jamaica Hospital was aware as a result of the fact that DiMaria was both an owner of TJH and a member of Jamaica Hospital's Board of Trustees.

114.    Finally, as owners of TJH, both DiMaria and Santucci have a direct financial relationship with TJH to which they controlled referrals from Jamaica Hospital and Trump Pavilion.

115.    Subject to certain exceptions not applicable here, the Stark Statute prohibits referrals for designated health services by a physician to an entity in which the physician has a financial relationship.  42 U.S.C. § 1395nn(a)(1).

116.    Due to the direct and indirect compensation arrangements between DiMaria, Santucci, TJH, and Jamaica Hospital, defendants engaged in, and billed Medicare and Medicaid for, prohibited self-referrals.

E.    **Unlawful Payments for Referral of Patients**

117.    As detailed below, the "practice earnings" paid by TJH constitute unlawful payments for the referral of patients.

118.    Unless they are admitted by a private physician, patients admitted to Jamaica Hospital through the emergency room are considered "service patients."

25

119.   However, if a discharged patient has been seen in follow-up care at TJH, and is readmitted to Jamaica Hospital, Defendants allow that patient to be treated as a private patient. Under TJH's agreement with Jamaica Hospital, the TJH doctor then receives 60% to 80% of the fees received, including from Medicare and Medicaid, for physician services provided by the TJH doctor at the hospital.

120.   This additional percentage payment was provided by Jamaica Hospital and TJH as an "additional incentive" to the TJH doctors.

121.   Similarly, TJH doctors receive 60% to 80% of the fees received, including from Medicare and Medicaid, for each referral made to Jamaica Hospital and services provided at the hospital by TJH doctors to patients admitted from Trump Pavilion.

122.   As Chairman of Medicine at Jamaica Hospital, Santucci was able to, and did, assign patients admitted to Jamaica Hospital to TJH doctors.  These assignments included "service" patients who were not established patients of TJH or whose primary care physician had no medical staff privileges at Jamaica Hospital.

123.   As a result of this incentive arrangement, TJH doctors were encouraged to refer, and paid for referring, patients from Jamaica Hospital to TJH for follow-up care, and then to refer those same patients back to Jamaica Hospital if the patient needed hospitalization.

124.   TJH, and Santucci and DiMaria as owners of TJH, received 20% to 40% of the fees received, including from Medicare and Medicaid, for physician services provided by the TJH doctor at the hospital.

125.   Similarly, as Medical Director of Trump Pavilion and Schulman Nursing Home, DiMaria was able to, and did, assign nursing home patients to TJH physicians.

126.    As a result of this incentive arrangement, TJH doctors were encouraged to refer, and paid for referring, patients from Trump Pavilion to Jamaica Hospital for treatment.

127.    TJH, and Santucci and DiMaria as owners of TJH, receive 20% to 40% of the fees received, including from Medicare and Medicaid, for each of the referrals made to Jamaica Hospital and services provided at the hospital by the TJH doctor to patients admitted from Trump Pavilion.

128.    Thus, the aggregate compensation to DiMaria, Santucci, and each of the TJH Physicians varied with, took into account, were based on, or otherwise reflected the volume and value of referrals or other business generated by the referring physician.

129.    In addition, Jamaica Hospital provided additional incentives to TJH and TJH Physicians solely to induce referrals including, but not limited to:

    a..    offering below-market rent for offices including free janitorial services, utilities, stationary, collection of medical waste, subsidized parking for patients, phone, fax, and pager services;

    b.    offering human resources services to employees TJH at no cost; and

    c.    providing malpractice insurance for TJH Physicians through the Jamaica Hospital insurance policy free of charge.

130.    As a result of these compensation arrangements and other incentives detailed above, Defendants engaged in, and billed Medicare and Medicaid for, medical services provided to patients obtained through the unlawful payment of referral fees and/or kickbacks.

**F.    False and Fraudulent Claims and Statements**

131.    The physicians with whom TJH entered into financial relationships specified in paragraphs 110 -114 above referred patients, including Medicare and Medicaid patients, to Jamaica Hospital in violation of the Stark Statute.

27

132.    Jamaica Hospital and TJH, in turn, presented, or caused to be presented through the fiscal intermediary and carrier, claims for payment to the Medicare program designated health services provided on referrals from the physicians with whom it had entered into prohibited financial relationships as set forth in paragraphs 110 -114.

133.    Jamaica Hospital and TJH also presented, or caused to be presented through the New York State Department of Health, claims for payment to the Medicaid program for designated health services provided on referrals from the physicians with whom it had entered into prohibited financial relationships as set forth in paragraphs 110 -114.

134.    Jamaica Hospital and TJH thereby obtained payments from the United States and the State of New York in violation of the Stark Statute.

135.    Under the FCA, 31 U.S.C. § 3729(a)(1)(A), and the NYFCA, N.Y. Fin. Law § 189(1)(a), the claims set forth in paragraphs 132 and 133 above were false and/or fraudulent because Jamaica Hospital and TJH were prohibited by the Stark Statute from obtaining payment from the United States and the State of New York for claims for designated health services provided on referrals from the physicians with whom it had entered into financial relationships as set forth in paragraphs 110 -114.

136.    Jamaica Hospital also violated the FCA, 31 U.S.C. § 3729(a)(1)(B), and the NYFCA, N.Y. Fin. Law § 189(1)(b) by making false statements, or causing false statements to be made by the fiscal intermediary and carrier, to get claims paid by Medicare for designated health services provided on referrals from the physicians with whom it had entered into financial relationships as set forth in paragraphs 110 -114. Jamaica Hospital's certifications on its cost reports that its statements were "true" and/or "correct" and that it was entitled to payment of its claims for such services were false or fraudulent because the Stark Statute prohibited Jamaica

Hospital from receiving payments from the United States and the State of New York for those claims.

137.    Jamaica Hospital knowingly made, used, or caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States and the State of New York (i.e., to avoid refunding payments made in violation of the Stark Statute) by certifying on its annual cost reports that the services were provided in compliance with federal and state law, all in violation of the FCA, 31 U.S.C. § 3729(a)(1)(G) and the NYFCA, N.Y. Fin. Law § 189(1)(h).  The false certifications, made with each annual cost report submitted to the government, were part of Jamaica Hospital's unlawful scheme to defraud Medicare and Medicaid, and other government healthcare programs.

138.    All claims submitted to Medicare or Medicaid by Jamaica Hospital and TJH for designated health services referred to by any of the physicians identified in paragraphs 110 -114 were false claims submitted to the United States and the State of New York.

139.    Jamaica Hospital and TJH presented, or caused to be presented, all of said false claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

## G.    Billing For Medically Unnecessary Consultations

140.    42 C.F.R. § 411.351 defines "consultation" as a professional service furnished to a patient by a physician if:

> (1) The physician's opinion or advice regarding evaluation or management or both of a specific medical problem is requested by another physician.

> (2) The request and need for the consultation are documented in the patient's medical record.

> (3) After the consultation is provided, the physician prepares a written report of his or her findings, which is provided to the physician who requested the

consultation.

141.   Both federal and state regulations require that services provided by health care practitioners be "medically necessary" in order to qualify for reimbursement under Medicare or Medicaid. See 42 C.F.R. § 1004.10; 18 N.Y.C.R.R. §§ 505.1(a) & 515.2(b).

142.   In or about 2008, and continuing to the present, Jamaica Hospital's Department of Physical Medicine and Rehabilitation had a perpetually low patient census.

143.   In or about 2008, and continuing to the present, Jamaica Hospital instituted a procedure whereby physicians employed by TJH in the Physical Medicine and Rehabilitation Department ("Rehab Specialists") were routinely directed to "consult" on patients admitted to Jamaica Hospital without such consultation being requested by the attending physician.

144.   Pursuant to this procedure, Rehab Specialists evaluated numerous Medicare beneficiaries and formulated a treatment plan, consisting of a further referral for physical therapy.

145.   Specifically, Rehab Specialists conducted evaluations on numerous Medicare beneficiaries for whom the Relator was the attending physician, but for whom no request for consultation had been made.

146.   Further, the medical records for these patients did not contain requests for a consultation by the Rehab Specialist signed by the requesting physician. Instead, some of the information about the requesting physician and service was filled out by the Rehab Specialist who did the consultation.

147.   Moreover, many of these consultations were medically unnecessary inasmuch as they were for patients who could not benefit from rehabilitation consultations, had received consultations on earlier occasions, and/or were too sick to participate in rehabilitation.

148.    Defendants submitted bills to Medicare for these consultations and for physical therapy ordered as a result of the consultation.

149.    For example, the following claims were submitted by Jamaica Hospital and TJH for consultations that were not requested by the Relator, who was the attending physician, and were unnecessary:

| Date of Consultation | Physician |
| --- | --- |
| 4/10/2008 | Svetlana Gavrilova |
| 5/6/2008 | Robert Kaylakov |
| 7/2008 | Mohamad Choudhry |
| 8/7/2008 | Mohamad Choudhry |
| 8/29/2008 | Mohamad Choudhry |
| 2/4/2009 | Mohamad Choudhry |
| 3/16/2009 | Mohamad Choudhry |
| 4/10/2009 | Hu Lisa |
| 9/29/2009 | Robert Kaylakov |
| 6/22/2011 | Hu Lisa |

150.    Therefore, bills submitted by defendants to obtain payment for these unauthorized and unnecessary consultations violated federal and state regulations, as well as, Title XVIII of the Social Security Act, Section 1862(a)(1)(A) which "allows coverage and payment for only those services that are considered reasonable and necessary."

151.    The claims set forth in paragraphs 148-149 above were false and/or fraudulent because Jamaica Hospital and TJH were prohibited by federal and state law and regulations from obtaining payment from Medicare and Medicaid for medically unnecessary services.

## COUNT I
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(1)(A), Presenting Claims
to Medicare and Medicaid for Designated Health Services
Rendered as a Result of Violations of the Stark Statute and Anti-Kickback Laws**

152.    Plaintiffs repeat and realleges ¶¶ 1 to 151 as if fully set forth herein.

153.    Defendants knowingly provided kickbacks or other illegal remuneration to induce TJH physicians to refer Medicare and Medicaid patients to them for the provision of medical services.

154.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement for designated health services rendered to patients who were referred by physicians with whom Jamaica Hospital and TJH had entered into prohibited financial relationships in violation of the Stark Statute and/or Anti-Kickback Act.

155.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

156.    By virtue of the false or fraudulent claims made and caused to be made by defendants, the United States has suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT II
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(1)(B), Making or Using False
Records or Statements to Cause Claims to Be Paid
In Connection with Designated Health Services Rendered
As a Result of Violations of the Stark Statute and Anti-Kickback Laws**

157.    Plaintiffs repeat and realleges ¶¶ 1 to 156 as if fully set forth herein.

158.    Defendants knowingly (*i.e.*, with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the false certifications and representations made and caused to be made by Jamaica Hospital and TJH, that the services were provided in compliance with all laws regarding the provision of health care services – to get false or fraudulent claims paid or approved by the United States.

159.    By virtue of the false records or statements made and caused to be made by Defendants, the United States has suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT III
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(1)(C), Conspiring to Submit False Claims in Connection with Violations of the Stark Statute and Anti-Kickback Laws**

160.    Plaintiffs repeat and reallege ¶¶ 1 to 159 as if fully set forth herein.

161.    Defendants conspired to defraud the United States by getting a false or fraudulent claim paid by Medicare and/or Medicaid.

162.    By virtue of the conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT IV
### (All Defendants)

### False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### False Record to Avoid an Obligation to Refund Payments
### Received in Connection with Violations of the
### Stark Statute and Anti-Kickback Laws

163.    Plaintiff repeats and realleges ¶¶ 1 to 162 as if fully set forth herein.

164.    Defendants made and used or caused to be made or used false records or statements – *i.e.,* the false certifications made or caused to be made by Jamaica Hospital in submitting the cost reports – to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

165.    Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

166.    By virtue of the false records or false statements made by Defendants, the United States suffered damages and therefore is entitled to recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT V
### (All Defendants)

### False Claims Act, 31 U.S.C. § 3729(a)(1)(A) Presenting
### Claims to Medicare and Medicaid for Services
### That Were Not Medically Necessary

167.    Plaintiffs repeat and realleges ¶¶ 1 to 166 as if fully set forth herein.

168.    Jamaica Hospital and TJH knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States for consultations by Rehab Physicians and physical therapy without a request from the attending physician and when such consultations and physical therapy were not medically necessary.

34

169.     Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

170.     By virtue of the false or fraudulent claims made and caused to be made by defendants, the United States have suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT VI
### (All Defendants)

### False Claims Act, 31 U.S.C. § 3729(a)(1)(B) Making or Using False Records or Statements to Cause Claims to Be Paid For Services That Were Not Medically Necessary

171.     Plaintiffs repeat and reallege ¶¶ 1 to 170 as if fully set forth herein.

172.     Defendants knowingly (i.e., with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the false certifications and representations made and caused to be made by Jamaica Hospital and TJH, that the services were provided in compliance with all laws regarding the provision of health care services – to get false or fraudulent claims paid or approved by the United States.

173.     By virtue of the false records or statements made and caused to be made by Defendants, the United States has suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT VII
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(1)(C), Conspiring to
Submit False Claims For Services That Were Not Medically Necessary**

174.   Plaintiffs repeat and reallege ¶¶ 1 to 173 as if fully set forth herein.

175.   Defendants conspired to defraud the United States by getting a false or fraudulent claim paid by Medicare and/or Medicaid.

176.   By virtue of the conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT VIII
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
False Record to Avoid an Obligation to Refund Payments Received
For Services That Were Not Medically Necessary**

177.   Plaintiff repeats and realleges ¶¶ 1 to 176 as if fully set forth herein.

178.   Defendants made and used or caused to be made or used false records or statements – *i.e.,* the false certifications made or caused to be made by Jamaica Hospital in submitting the cost reports – to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

179.   Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

180.   By virtue of the false records or false statements made by Defendants, the United States suffered damages and therefore is entitled to recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

36

## COUNT IX
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(a), Presenting Claims
to Medicaid for Designated Health Services Rendered as a
Result of Violations of the Stark Statute and Anti-Kickback Laws**

181.   Plaintiffs repeat and reallege ¶¶ 1 to 180 as if fully set forth herein.

182.   Defendants knowingly provided kickbacks or other illegal remuneration to induce TJH physicians to refer Medicaid patients to them for the provision of medical services.

183.   Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of New York, including those claims for reimbursement for designated health services rendered to patients who were referred by physicians with whom Jamaica Hospital and TJH had entered into prohibited financial relationships in violation of the Stark Statute and/or the Anti-Kickback laws.

184.   Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

185.   By virtue of the false or fraudulent claims made and caused to be made by defendants, the State of New York has suffered damages and therefore is entitled to treble damages under the NYFCA in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT X
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(b), Making or Using False
Records or Statements to Cause Claims to Be Paid
In Connection with Designated Health Services Rendered
As a Result of Violations of the Stark Statute and Anti-Kickback Laws**

186.   Plaintiffs repeat and reallege ¶¶ 1 to 185 as if fully set forth herein.

187.    Defendants knowingly (i.e., with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the false certifications and representations made and caused to be made by Jamaica Hospital and TJH, that the services were provided in compliance with all laws regarding the provision of health care services – to get false or fraudulent claims paid or approved by the State of New York.

188.    By virtue of the false records or statements made and caused to be made by Defendants, the State of New York has suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XI
## (All Defendants)

### New York False Claims Act, N.Y. Fin. Law § 189(1)(c), Conspiring to Submit False Claims in Connection with Violations of the Stark Statute and Anti-Kickback Laws

189.    Plaintiffs repeat and reallege ¶¶ 1 to 188 as if fully set forth herein.

190.    Defendants conspired to defraud the State of New York by getting a false or fraudulent claim paid by Medicare and Medicaid.

191.    By virtue of the conspiracy to defraud the State of New York, the State of New York suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XII
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(h), False Record to Avoid an Obligation to Refund Payments Received in Connection with Violations of the Stark Statute and Anti-Kickback Laws**

192.    Plaintiffs repeat and reallege ¶¶ 1 to 191 as if fully set forth herein.

193.    Defendants made and used or caused to be made or used false records or statements – *i.e.,* the false certifications made or caused to be made by Jamaica Hospital in submitting the cost reports – to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New York.

194.    Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

195.    By virtue of the false records or false statements made by Defendants, the State of New York suffered damages and therefore is entitled to recovery as provided by the NYFCA of an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XIII
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(a), Presenting Claims to Medicaid for Services That Were Not Medically Necessary**

196.    Plaintiffs repeat and reallege ¶¶ 1 to 195 as if fully set forth herein.

197.    Jamaica Hospital and TJH knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of New York for consultations by Rehab Physicians and physical therapy without a request from the attending physician and when such consultations and physical therapy were not medically necessary.

198.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

199.    By virtue of the false or fraudulent claims made and caused to be made by defendants, the State of New York has suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XIV
### (All Defendants)

### New York False Claims Act, N.Y. Fin. Law § 189(1)(b), Making or Using False Records or Statements to Cause Claims to Be Paid For Services That Were Not Medically Necessary

200.    Plaintiffs repeat and reallege ¶¶ 1 to 199 as if fully set forth herein.

201.    Defendants knowingly (*i.e.*, with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements -- including but not limited to the false certifications and representations made and caused to be made by Jamaica Hospital and TJH, that the services were provided in compliance with all laws regarding the provision of health care services – to get false or fraudulent claims paid or approved by the State of New York.

202.    By virtue of the false records or statements made and caused to be made by Defendants, the State of New York has suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XV
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(c), Conspiring to Submit False Claims for Services That Were Not Medically Necessary**

203.　Plaintiffs repeat and reallege ¶¶ 1 to 202 as if fully set forth herein.

204.　Defendants conspired to defraud the State of New York by getting a false or fraudulent claim paid by Medicare and Medicaid.

205.　By virtue of the conspiracy to defraud the State of New York, the State of New York suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XVI
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(h), False Record to Avoid an Obligation to Refund in Connection with Violations of the Stark Statute and Anti-Kickback Laws for Services That Were Not Medically Necessary**

206.　Plaintiffs repeat and reallege ¶¶ 1 to 205 as if fully set forth herein.

207.　Defendants made and used or caused to be made or used false records or statements – *i.e.,* the false certifications made or caused to be made by Jamaica Hospital in submitting the cost reports – to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New York.

208.　Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

209.　By virtue of the false records or false statements made by Defendants, the State of New York suffered damages and therefore is entitled to recovery as provided by the NYFCA of an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

41

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of the United States and the State of New York, demands and prays that judgment be entered in its favor against Defendants, jointly and severally, as follows:

1.     On the Counts under the False Claims Act treble the amount of damages sustained by the United States and civil penalties for each false claim or false statement, as provided by law; and

2.     On the Counts under the NYFCA treble the amount of damages sustained by the State of New York and civil penalties for each false claim or false statement, as provided by law; and

3.     For all Causes of Action alleged herein by Relator, all expenses and attorneys' fees related to this legal action, as provided by law; and

4.     Any other equitable relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Satish K. Deshpande, M.D., hereby demands a trial by jury.

Dated:     White Plains, New York
           July 15, 2013

                    **YANKWITT & McGUIRE, LLP**

           By:     _____
                   Kathy S. Marks
                   Russell M. Yankwitt
                   140 Grand Street, Suite 501
                   White Plains, New York 10601
                   Tel: (914) 686-1500